## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SOPHIA KIWANUKA<br>1832 Connecticut Ave. NW<br>Washington, DC 20009<br><br>  Plaintiff,<br><br>v.<br><br>ANNE MARGRETH BAKILANA<br>6564 Flagmaker Court<br>Falls Church, VA 22042<br><br>RAYMOND D. RWEHUMBIZA<br>6564 Flagmaker Court<br>Falls Church, VA 22042<br><br>  Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  Case No. _____<br>)<br>)<br>)<br>)  JURY TRIAL DEMANDED<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Sophia Kiwanuka, by and for her Complaint in the above-captioned matter, alleges as follows:

### PRELIMINARY STATEMENT

1.    Plaintiff Sophia Kiwanuka (hereinafter "Ms. Kiwanuka") was trafficked for forced labor into the United States by Defendants Anne Margreth Bakilana (hereinafter "Bakilana") and Raymond D. Rwehumbiza (hereinafter "Rwehumbiza") (collectively "Defendants"). The Defendants lured Ms. Kiwanuka to the United States with promises of reasonable working conditions and educational opportunities, but instead effectively imprisoned Ms. Kiwanuka and subjected her to slavery-like practices, involuntary servitude, and forced labor, all in violation of international, federal, and state law.

2.     Immediately upon her arrival in the United States, the Defendants confiscated Ms. Kiwanuka's passport and isolated Ms. Kiwanuka from the outside world.  The Defendants exploited Ms. Kiwanuka's fear of deportation in order to manipulate and control her.  They instructed her not to talk with neighbors or make acquaintances in the United States.

3.     From May 2004 until July 2006 and again from January 2009 until August 2009, Defendants Bakilana and Rwehumbiza forced Ms. Kiwanuka to work as a domestic servant and nanny in their home.  Ms. Kiwanuka was forced to work seven days a week, receiving no breaks for vacation, sick leave, or personal time.  During these periods, the Defendants paid her three hundred dollars ($300) a month, or roughly fifty-five cents ($0.55) per hour for her eighteen-hour days.

4.     In 2009 the FBI opened a criminal investigation of the Defendants' suspected trafficking of Ms. Kiwanuka.  As part of the investigation, Ms. Kiwanuka agreed to wear a video and audio recording device supplied by the FBI.

5.     Confronted with evidence collected by Ms. Kiwanuka, Defendant Bakilana executed a plea agreement with the United States on March 29, 2010, in which she agreed to plead guilty to two counts of knowingly and willfully making materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the government of the United States, in violation of 18 U.S.C. § 1001(a)(2).  *See* Plea Agreement, Att. A at 1.

6.     In particular, Bakilana admitted making two materially false statements to the FBI in conjunction with the FBI's investigation of Bakilana for the suspected human trafficking of Ms. Kiwanuka.  *See* Statement of Facts, Att. B at 6-8.

7.      As part of her plea agreement, Bakilana further admitted that Ms. Kiwanuka was the victim of an offense listed in 18 U.S.C. § 3663A(c)(1)(a) and that Bakilana therefore owed Ms. Kiwanuka restitution. *See* Plea Agreement, Att. A at 5-6.

8.      On July 2, 2010, Bakilana was sentenced in the United States District Court for the Eastern District of Virginia to two years' probation and ordered to pay Ms. Kiwanuka $41,626.80 as restitution.

9.      Ms. Kiwanuka seeks damages for having been trafficked into the United States for forced labor.  She also seeks damages for various state torts and additional unpaid wages.

## JURISDICTION AND VENUE

10.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 216(b).  This Court has supplemental jurisdiction over Ms. Kiwanuka's state law claims pursuant to 28 U.S.C. § 1367.  This Court has jurisdiction over Ms. Kiwanuka's international law claims pursuant to 28 U.S.C. §§ 1331 and 1367.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(d) because the Defendants are citizens of a foreign state.

## PARTIES

12.     Plaintiff Sophia Kiwanuka is a 26-year-old citizen of Tanzania, currently residing in the United States.  At the time of the events that gave rise to this Complaint, Ms. Kiwanuka was legally residing in the United States under a G-5 non-immigrant visa, which had been arranged by the Defendants.

13.     At all times relevant hereto, Defendant Bakilana was employed in Washington, D.C., as an economist for the World Bank Group.  When the Defendants first trafficked Ms. Kiwanuka into the United States in 2004, Bakilana and Rwehumbiza lived with their four-month

old son in Rosslyn, Virginia.   In 2005, the Defendants moved to a new apartment.    Upon information and belief, this new apartment was located in Falls Church, Virginia.   When the Defendants brought Ms. Kiwanuka back to the United States in 2009, they lived with their eldest son (then four years old) and a newborn son (then three months old) in a home they had purchased at 6564 Flagmaker Court in Falls Church, Virginia.

## FACTUAL ALLEGATIONS

### Ms. Kiwanuka's Early Relationship with the Defendants

14.    Ms. Kiwanuka was born in Tanzania on December 27, 1983.   Her family has struggled to make ends meet since her father died when Ms. Kiwanuka was young.   Before being trafficked to the United States, Ms. Kiwanuka's English skills were limited.

15.    In 2002, Ms. Kiwanuka was desperate to obtain financing for her education.   Ms. Kiwanuka's deceased father had been acquainted with Bakilana's mother, and Ms. Kiwanuka's mother suggested Ms. Kiwanuka contact Bakilana's family to seek assistance.

16.    Ms. Kiwanuka traveled to Dar-es-Salaam to visit Bakilana's extended family. Bakilana and Rwehumbiza were themselves briefly visiting from the United States to attend a wedding.   This was the first time Ms. Kiwanuka met the Defendants.

17.    Bakilana is a Ph.D.-educated economist who comes from a wealthy and influential family in Tanzania.

18.    Rwehumbiza's family is also prominent, well-connected, and powerful. Rwehumbiza is related by marriage to the former Speaker of the Tanzanian Parliament.

19.    From 2002 Ms. Kiwanuka worked intermittently as a domestic servant and nanny for Bakilana's parents in Dar-es-Salaam.   In return, the family sometimes provided assistance

with Ms. Kiwanuka's school fees.   Because Ms. Kiwanuka was determined to raise enough money to complete her education, she continued to work for the Bakilana family off and on until October 2003.   At that time, Ms. Kiwanuka returned to her home village of Mtapa to attend boarding school.

**The Defendants Deceive Ms. Kiwanuka into Working for Them in the United States**

20.     In or about late March or early April 2004, Bakilana contacted Ms. Kiwanuka and asked her to relocate to the United States to work as a domestic servant.   Having just entered boarding school, Ms. Kiwanuka was reluctant to interrupt her studies.   Bakilana reassured Ms. Kiwanuka with promises that she could continue her education in the United States.   Bakilana claimed to have identified a good school that Ms. Kiwanuka could attend.

21.     In April 2004, Ms. Kiwanuka—then 21 years old—traveled from her home village to Dar-es-Salaam to complete immigration paperwork.   At that time, Ms. Kiwanuka had never been aboard an airplane and had never traveled outside of Tanzania.

22.     Bakilana had prepared Ms. Kiwanuka's immigration documents beforehand and pressured Ms. Kiwanuka to sign them without explaining their significance or permitting Ms. Kiwanuka to read them.

23.     Bakilana applied for Ms. Kiwanuka's passport without Ms. Kiwanuka's knowledge or permission.   The passport consequently contained numerous errors, including listing Ms. Kiwanuka's birth year as 1981 rather than 1983 and her place of birth as Dar-es-Salaam rather than Bukoba.   Likewise, Bakilana had completed other visa forms in advance without consulting Ms. Kiwanuka.   Ms. Kiwanuka was simply instructed to sign the paperwork without an opportunity to read or understand it.

24.     Bakilana also prepared and executed an employment contract for Ms. Kiwanuka. The contract stated Ms. Kiwanuka was to work from 9:00 am until 5:00 pm on Monday through Thursday and to work from 9:00 am until 3:00 pm on Friday.   Under the contract's terms, Ms. Kiwanuka was to have weekends off and was to receive paid time off for holidays (5 days), vacation (20 days), and illness (12 days).   The contract obligated Bakilana to maintain health insurance coverage for Ms. Kiwanuka and to pay required payroll taxes.   The contract stated that Ms. Kiwanuka was to be paid $7.50 per hour for her services, as well as overtime pay at 1.5 times the base hourly wage for work in excess of 40 hours per week.

25.     Ms. Kiwanuka accepted the terms of the contract, thus forming an employment contract with Bakilana.

## The Defendants Isolate Ms. Kiwanuka and Subject Her to Forced Labor

26.     In May 2004 Ms. Kiwanuka traveled from Tanzania to the United States.

27.     Upon arrival, she was taken to the Defendants' two-bedroom apartment in Rosslyn, Virginia.   Bakilana immediately confiscated Ms. Kiwanuka's documents, including her passport.   Bakilana asserted she was entitled to retain the passport because she had paid for it. When Ms. Kiwanuka turned to Rwehumbiza for help retrieving her passport, he advised her simply to accept her situation.   Rwehumbiza provided no help or assistance.

28.     During 2005, Ms. Kiwanuka and Bakilana attended a required workshop for World Bank employees and their domestic help.   Because of her limited English proficiency, Ms. Kiwanuka did not understand the information presented at the workshop.   Bakilana pretended to translate for Ms. Kiwanuka's benefit but intentionally misled her regarding the content of the workshop.   Bakilana falsely attributed to the World Bank program the following misinformation:

   a)  that if Ms. Kiwanuka left the Defendants' employment, she would be
       deported within twenty-four hours back to Tanzania;

6

b) that Ms. Kiwanuka should maintain the Defendants' confidences and not discuss her employment situation with anyone outside the Defendants' home; and

c) that Ms. Kiwanuka should entrust her belongings—including her passport and other travel documents—to the Defendants.

29.     Seven days a week, from roughly 5:00 am until 11:00 pm or later, the Defendants forced Ms. Kiwanuka to clean their bedrooms, bathroom, kitchen, and living spaces; sort, wash, iron, and fold clothing for the Defendants and their infant son; prepare separate breakfasts and lunches for the Defendants and their son; wash dishes; and arrange the apartment. The Defendants were very meticulous and demanding about the chores Ms. Kiwanuka was forced to perform, requiring for example that she rise at dawn to soak lentils rather than allowing them to soak overnight.

30.     The Defendants forced Ms. Kiwanuka to share a bedroom with the Defendants' four-month-old son. Ms. Kiwanuka and the son shared a mattress on the floor, and Ms. Kiwanuka was required to attend constantly to the son. Ms. Kiwanuka was made to clean and bathe the son, prepare dinner for him, and wake with him throughout the night to feed, change, and coddle him back to sleep. Ms. Kiwanuka was routinely awakened about five times each night in order to care for the Defendants' son. It was Ms. Kiwanuka's responsibility not to allow the son to disturb the Defendants during the night. Thus, Ms. Kiwanuka's work day literally did not end; she was on call twenty-four hours a day.

31.     Ms. Kiwanuka was forced to work every day, including weekends. She was not given time off for vacation, sickness, or personal time. The Defendants warned Ms. Kiwanuka not to converse with or become friendly with anyone outside the home, particularly the neighbors.

32.     In February 2006, Bakilana prepared and executed a successor employment contract with Ms. Kiwanuka. The contract indicated Ms. Kiwanuka would work 40 hours per week, although it specified a total of 42 hours per week as follows:  from 9:00 am until 5:00 pm on Mondays, Wednesdays, and Fridays; and from 9:00 am until 6:00 pm on Tuesdays and Thursdays.  The contract specified that Ms. Kiwanuka was to receive paid time off for holidays (five days), sickness (12 days), and vacation (20 days).  The contract obligated Bakilana to maintain health insurance coverage for Ms. Kiwanuka and to pay required payroll taxes.  The contract stated Ms. Kiwanuka would be paid $7.50 per hour for her services and would be eligible for overtime pay as required by law.

33.     Despite this reaffirmation of Ms. Kiwanuka's wages, benefits, and working conditions, the Defendants' treatment of Ms. Kiwanuka did not change.

**The Defendants' Threats and Mistreatment of Ms. Kiwanuka**

34.     The Defendants routinely threatened to report Ms. Kiwanuka to United States immigration authorities for deportation.  They misrepresented to Ms. Kiwanuka that if she failed to obey their commands United States officials would send her back to Tanzania within twenty-four hours and permanently bar her from re-entering the United States.

35.     In addition to threatening to initiate United States deportation processes, the Defendants also subjected Ms. Kiwanuka to constant verbal and psychological abuse.

36.     Any time that Ms. Kiwanuka failed to meet the Defendants' unreasonable expectations or failed to anticipate their demands, Bakilana screamed at her, humiliating and shaming her.  Bakilana routinely questioned Ms. Kiwanuka's competence and dismissively suggested Ms. Kiwanuka was no more capable than the Defendants' four-month-old son.

37.     On one occasion, Bakilana locked her own son in his room to punish him.  When Ms. Kiwanuka attempted to enter the room, Bakilana became furious.  Bakilana picked Ms. Kiwanuka up by her shirt collar and screamed at her.

38.     On multiple occasions while Ms. Kiwanuka remained under their control, Defendants negligently failed to provide appropriate medical care for Ms. Kiwanuka. Furthermore, Ms. Kiwanuka received no dental care.

39.     On one occasion, as Ms. Kiwanuka was handling a pot of boiling water, Bakilana yelled at Ms. Kiwanuka in response to the Defendants' son waking up.  Bakilana's outburst startled Ms. Kiwanuka, causing her to spill the water on her leg, scalding and blistering her thigh. The Defendants negligently refused to seek medical attention for the burn, which left a permanent two-inch scar on Ms. Kiwanuka's leg.

40.     On another occasion, Bakilana negligently left a broken glass jar in the cluttered kitchen sink.  When Ms. Kiwanuka reached into the sink, she sliced open her finger on a glass shard.  The Defendants refused to seek medical attention, and when Rwehumbiza attempted to help Ms. Kiwanuka dress the wound, Bakilana shouted at him not to assist Ms. Kiwanuka.

41.     Because of the repeated threats, frequent abuse, and routine neglect that she faced on a daily basis, Ms. Kiwanuka lived in constant terror of the Defendants.

**The Defendants Refuse to Pay Ms. Kiwanuka Her Promised Wages**

42.     Bakilana opened a shared bank account with Ms. Kiwanuka at the Bank-Fund Staff Federal Credit Union (hereinafter "Bank-Fund Account").  Bakilana directed and controlled this account and instructed Ms. Kiwanuka never to open or read any statements or other correspondence regarding the Bank-Fund Account.

43.    Bakilana misled Ms. Kiwanuka to believe that Ms. Kiwanuka did not have co-ownership or control of the Bank-Fund Account.

44.    In order to generate a deceptive paper trail, Bakilana deposited into the Bank-Fund Account funds sufficient to suggest Ms. Kiwanuka was receiving her appropriate wages. Upon information and belief, Bakilana set up the Bank-Fund Account and made these deposits in order to create the illusion of compliance with World Bank regulations.

45.    Bakilana set up a second account in Ms. Kiwanuka's name at Wachovia (hereinafter "Wachovia Account") and instructed Ms. Kiwanuka to transfer $300 each month from the Bank-Fund Account to the Wachovia Account.  This monthly transfer reflected Ms. Kiwanuka's actual effective wage.

46.    Ms. Kiwanuka did not understand that legally she had joint ownership and control over the Bank-Fund Account and, because of Bakilana's manipulations and misrepresentations, effectively had neither.

**Return Trip to Tanzania**

47.    In July 2006 the Defendants and their son returned to Tanzania to be married. They brought Ms. Kiwanuka with them.

48.    Bakilana instructed Ms. Kiwanuka to lie to her family when she saw them and to say that life in the United States was fine and that she was successfully attending school.  Neither claim was true.

49.    Bakilana told Ms. Kiwanuka's mother that Ms. Kiwanuka was lazy and incompetent, slandering Ms. Kiwanuka to her own mother.

50.    Before the scheduled return to the United States, Ms. Kiwanuka was permitted to travel from Dar-es-Salaam to her native village for a visit.  Upon Ms. Kiwanuka's return to Dar-

es-Salaam, Bakilana told Ms. Kiwanuka that Ms. Kiwanuka had missed her opportunity to renew her visa and could not travel back to the United States. Bakilana refused to return Ms. Kiwanuka's passport.

51. The Defendants and their son returned to the United States without Ms. Kiwanuka. Shortly afterwards, they brought another Tanzanian servant, named Mariam, to the United States to serve in their household.

52. Bakilana's family retained possession of Ms. Kiwanuka's passport and refused to return it to her. The family likewise held onto Ms. Kiwanuka's luggage and other belongings. Ms. Kiwanuka thus remained in Tanzania without access to her passport, despite her pleas that it be returned.

53. Over the next few years, Ms. Kiwanuka returned to her home and attempted to continue her studies. She periodically tried to contact Bakilana and Bakilana's family in order to retrieve her passport and possessions, but her requests were ignored.

**Defendants Deceive Ms. Kiwanuka into Returning to the United States**

54. In 2008 the Defendants unexpectedly resumed contact with Ms. Kiwanuka. Bakilana told Ms. Kiwanuka that she could return to the United States to work for a different family. Ms. Kiwanuka believed she would be working for Rwehumbiza's brother. She was reinforced in this belief by her understanding that Mariam continued to work for the Defendants. In fact, the Defendants lied and secretly intended that Ms. Kiwanuka would return to work for them.

55. Bakilana again assured Ms. Kiwanuka that she would be able to attend school in the United States. Because Ms. Kiwanuka believed she would be working for Rwehumbiza's brother and not the Defendants, she was persuaded that her circumstances would be different

from her previous experience in the United States and that she would indeed have the opportunity to attend school.  In fact, the Defendants had no intention of allowing Ms. Kiwanuka to attend school or continue her studies.

56.    Misled by the Defendants with respect to who would employ her and to her educational opportunities, Ms. Kiwanuka returned to Dar-es-Salaam to complete another round of paperwork.  Ms. Kiwanuka met with Bakilana's brother to sign the paperwork.

57.    All paperwork had also been completed in advance without Ms. Kiwanuka's participation or input.  Bakilana's brother gave Ms. Kiwanuka no opportunity to examine or review the paperwork but instead pressured her to sign hurriedly.

58.    Ms. Kiwanuka signed the documents without understanding their significance or contents.

59.    One document was a new, one-year employment contract.  This employment contract had been signed by Bakilana on September 25, 2008.  It indicated Ms. Kiwanuka would work 40 hours per week, Monday through Friday from 9:00 am to 5:00 pm.  Ms. Kiwanuka's duties were to include caring for the Defendants' eldest son, then aged four years, and an infant, then aged three months.  The contract specified that Ms. Kiwanuka was to receive paid time off for holidays (five days), sickness (12 days), and vacation (20 days).  The contract obligated Bakilana to maintain health insurance coverage for Ms. Kiwanuka and to pay required payroll taxes.  The contract stated Ms. Kiwanuka would be paid $8.50 per hour for her services and would be eligible for overtime pay as required by law.

60.    Ms. Kiwanuka signed this second contract on October 16, 2008, thus forming an employment contract between herself and Bakilana.  Ms. Kiwanuka was confused as to why the new contract had been counter-signed by Bakilana when Ms. Kiwanuka was under the

impression she would be working for a different host family.  Ms. Kiwanuka asked Bakilana's brother about this apparent discrepancy.  Bakilana's brother said he did not know the answer.

61.     Ms. Kiwanuka believed that, because Bakilana was related to Rwehumbiza's family by marriage, it was permissible for Bakilana to counter-sign the paperwork despite Ms. Kiwanuka's expectation that Ms. Kiwanuka would work for Rwehumbiza's brother.

62.     In January 2009, one day before Ms. Kiwanuka was to depart Tanzania for her trip to the United States, Bakilana's brother finally returned her passport to her.  The passport was returned just in time for Ms. Kiwanuka to receive a new G-5 visa, travel to the airport, and board her flight.

### The Defendants Resume Their Previous Practice of Isolating and Exploiting Ms. Kiwanuka

63.     On January 17, 2009, Ms. Kiwanuka returned to the United States.  She was met at the airport by the Defendants and their two sons.  The Defendants transported Ms. Kiwanuka back to their home in Falls Church, Virginia.

64.     Ms. Kiwanuka was confused because she had believed she would be working for Rwehumbiza's brother.  The Defendants told her that their other servant, Mariam, was pregnant and had returned to Tanzania.  The Defendants further explained that Ms. Kiwanuka would therefore be working in the Defendants' home.

65.     Ms. Kiwanuka protested and asked for a better work schedule, improved conditions, and a chance to attend school.  Bakilana pretended to agree, but in fact nothing changed.  On the night of Ms. Kiwanuka's arrival she was pressed into service and made to care for and feed the Defendants' two young children:   one five-years-old and the other approximately six-months-old.

66.     The Defendants again confiscated Ms. Kiwanuka's passport.

67.     The Defendants renewed their previous threats, telling Ms. Kiwanuka that if she left their employment, they would report her to United States immigration officials and that Ms. Kiwanuka would then be deported and prohibited from ever returning to the United States.

68.     The Defendants again forced Ms. Kiwanuka into a grueling work schedule which ran from 6:00 am until 10:00 pm or later. Her daily duties included preparing a special Tanzanian porridge for breakfast; bathing, dressing, and feeding the children; walking the five-year-old son to school; cooking for and entertaining the six-month-old infant; picking up the older son after school; sorting, washing, folding, and ironing the family's laundry; cleaning the Defendants' four-bedroom, four-bathroom house; preparing lunch for the children and feeding them; assisting the older son with his homework and taking him to after-school mathematics classes three times a week; playing with the children outdoors; preparing dinner for the children and feeding them; bathing the children in the evening; putting the children to sleep; cleaning the kitchen and living room.

69.     The Defendants imposed so many demands, duties, and responsibilities on Ms. Kiwanuka that she had time for only one or two meals each day. Ms. Kiwanuka performed the same chores she had previously performed, but was now required to provide care for two young children. Ms. Kiwanuka shared a room and one closet with both the Defendants' sons. The Defendants forced Ms. Kiwanuka to sleep on a mattress on the floor, which she shared with the six-month-old infant.

70.     The Defendants required Ms. Kiwanuka to work seven days a week with no time for breaks. When Ms. Kiwanuka was ill, the Defendants refused to take her for medical treatment. The Defendants simply forced Ms. Kiwanuka to work through her periods of illness.

71.     Despite their previous assurances, the Defendants again prohibited Ms. Kiwanuka from attending school in the United States.  When Ms. Kiwanuka inquired about continuing her education, the Defendants ignored her or increased her household duties to preclude any time for studying, coursework, or attending classes.

72.     On one occasion, the eldest son's teacher gave Ms. Kiwanuka some lessons to work on.  When Bakilana discovered Ms. Kiwanuka completing schoolwork, she yelled at Ms. Kiwanuka.

73.     Bakilana resumed the scheme—described in ¶¶ 42-46 of this Complaint—of using two bank accounts to create a misleading paper trail while withholding from Ms. Kiwanuka the bulk of the wages and compensation she was contractually and statutorily owed. The Defendants effectively paid Ms. Kiwanuka only $300 per month.

74.     On one occasion, Bakilana took Ms. Kiwanuka to the Bank-Fund Staff Federal Credit Union and forced Ms. Kiwanuka to request checks and a debit card for the account.  Ms. Kiwanuka had neither asked for nor wanted the debit card.

75.     On the same occasion, Bakilana forced Ms. Kiwanuka to withdraw $3,500 from the Bank-Fund Account.  Upon returning to the Defendants' home, Bakilana demanded that Ms. Kiwanuka surrender the cash.  Seeing no alternative, Ms. Kiwanuka complied.

**Ms. Kiwanuka Escapes from the Defendants' Control**

76.     At some point during Ms. Kiwanuka's captivity and forced labor, an observant neighbor began to suspect Ms. Kiwanuka was a victim of human trafficking.  The neighbor reported her concerns to a national human trafficking hotline, which ultimately led to an FBI investigation.  An FBI agent met with Ms. Kiwanuka on July 5, 2009, and on several subsequent occasions.

77.     On July 27, 2009, as part of the FBI investigation, Ms. Kiwanuka received a postcard from a friend inviting her on a trip to New York City.   While wearing an audio and video recording device provided by the FBI, Ms. Kiwanuka asked Bakilana for a weekend off to travel to New York and for the return of her passport in order to make travel arrangements.

78.     Bakilana refused to give Ms. Kiwanuka a weekend off, despite the contractual stipulation that Ms. Kiwanuka would have free weekends.   Instead, Bakilana claimed that Bakilana needed Ms. Kiwanuka to accompany her and the children on a trip to London on August 1, 2009.  When Ms. Kiwanuka asked for her passport, Bakilana claimed the passport was at the British Embassy in order to obtain a visa for the London trip.

79.     Ms. Kiwanuka informed Bakilana that she refused to travel to London and intended to leave the Defendants' employ.  Bakilana threatened that if Ms. Kiwanuka attempted to quit, the FBI would immediately deport her.  Using the equipment provided by the FBI, Ms. Kiwanuka recorded Bakilana saying the following:

> They will take you right now to board a night plane for your return.
> Okay?  I can make a phone call to the FBI, they will bring you
> your passport on Monday.  Monday night you will board a plane
> because your visa would have been cancelled.  Choose.  You go to
> England and come back and I'll leave you with your passport for
> you to go whenever you want so you can learn.  I am not unable to
> find someone to help me do work.  I can leave the kids in England.
> I can take them to Tanzania.  This offer is what I told you about
> before:  if you want to disappear in America, disappear.  I am not
> preventing you and I can even help you disappear.  I can look for
> someone else and tomorrow – he or she – will be here to work.
> Your passport right now is at the British Embassy, but on Monday
> I will take it to work.

80.     On August 2, 2009, Rwehumbiza took Bakilana, their two sons, and Ms. Kiwanuka to Dulles International Airport for a trip to Tanzania.   At the airport security checkpoint, Ms. Kiwanuka informed a uniformed officer of the United States Department of

Homeland Security that she did not wish to board her flight.   The officer informed Ms. Kiwanuka that she was not required to fly and asked to see her passport.   Bakilana had possession of Ms. Kiwanuka's passport.   Bakilana surrendered Ms. Kiwanuka's passport to the officer.   Bakilana and the children subsequently returned to the Defendants' residence.   This was the last time Ms. Kiwanuka saw the Defendants.

81.     Based on the recordings made by Ms. Kiwanuka, Bakilana has since pled guilty to two felony counts of perjury in violation of 18 U.S.C. § 1001(a)(2), has been sentenced to probation for two years, and has been ordered to pay $41,626.80 in restitution.

82.     The Bakilana family has been searching for Ms. Kiwanuka since she made her escape.   The family has contacted Ms. Kiwanuka's family in Tanzania attempting to ascertain Ms. Kiwanuka's whereabouts.   Ms. Kiwanuka is afraid that the Defendants are seeking revenge for Ms. Kiwanuka's cooperation with federal authorities, which cooperation helped secure a conviction and judgment against Bakilana.   Ms. Kiwanuka lives in fear for her safety and must keep her current location and residence secret.

### FIRST CLAIM FOR RELIEF

**Involuntary Servitude in Violation of the Thirteenth Amendment to the U.S. Constitution and 18 U.S.C. § 1584**
**(Against Both Defendants)**

83.     Ms. Kiwanuka realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

84.     Ms. Kiwanuka brings this claim for relief under the private cause of action implied by the Thirteenth Amendment to the United States Constitution and under 18 U.S.C. § 1584, both of which prohibit involuntary servitude.

85.     As alleged herein, the Defendants Bakilana and Rwehumbiza held Ms. Kiwanuka in involuntary servitude, forcing her to work at times sixteen, eighteen, or more hours during a day and requiring her to tend to the Defendants' children at all hours of the night.

86.     Ms. Kiwanuka was highly susceptible to the Defendants' threats, and the Defendants exploited this vulnerability. Even prior to Ms. Kiwanuka's departure from Tanzania, the Defendants procured and took control of her travel documents. Defendant Bakilana pressured Ms. Kiwanuka to sign documents she had not reviewed, had not prepared, and did not understand.

87.     Through such actions, Defendants directed, assisted, conspired, and acted in concert with each other to create and perpetuate a system of involuntary servitude prohibited by the Thirteenth Amendment to the United States Constitution and 18 U.S.C. § 1584.

88.     As a direct and proximate result of these actions, Ms. Kiwanuka has suffered severe emotional distress, physical injuries, and economic losses.

89.     Plaintiff is therefore entitled to recover damages in an amount to be proven at trial, including attorneys' fees.

## SECOND CLAIM FOR RELIEF

**Trafficking with Respect to Peonage, Slavery, Involuntary Servitude, or Forced Labor in Violation of the Trafficking Victims Protection Act of 2000, 18 U.S.C. §§ 1590, 1595 (Against Both Defendants)**

90.     Ms. Kiwanuka realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

91.     By transporting Ms. Kiwanuka to the United States and, upon arrival, harboring her in their home all for the purposes of subjecting her to involuntary servitude, forced labor, and

enslavement, the Defendants engaged in trafficking of Ms. Kiwanuka in violation of 18 U.S.C. § 1590. Plaintiff is permitted to bring a civil cause of action under 18 U.S.C. § 1595.

92.     Numerous international instruments, customary international norms, domestic statutes and case law, and international case law establish that human trafficking violates the law of nations. Such authorities include the Universal Declaration of Human Rights, Dec. 10, 1948, G.A. Res. 217A(II), U.S. Doc. A/810 at 71; the International Covenant on Civil and Political Rights, Dec. 16, 1966, 999 G.A. Res. 2200A(XXI), U.N. Doc. A/6316, 999 U.N.T. S. 17, 61 I.L.M. 368 (1967); the Slavery, Security, Forced Labor and Similar Institutions and Practices Convention of 1926, Sept. 25, 1926, 60 U.N.T.S. 253; the Supplementary Convention on the Abolition of Slavery, the Slave Trade, and Institutions and Practices Similar to Slavery, Apr. 30, 1956, 266 U.N.T.S. 3; the Convention Concerning Forced or Compulsory Labour (ILO No. 29), June 28, 1930, 39 U.N.T.S. 55; the Convention Concerning the Abolition of Forced Labour (ILO No. 105), June 25, 1957, 320 U.N.T.S. 291; and the Protocol to Prevent, Suppress, and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime, Nov. 15, 2000, G.A. Res. 55/25, annex II, U.N. Doc. A/45/49.  These prohibitions against trafficking in persons are reflected in United States law in the Trafficking Victims Protection Act (TVPA), 18 U.S.C. § 1590, and other authorities.

93.     As a direct and proximate result of the Defendants' actions, Ms. Kiwanuka has sustained damages, including physical injury, emotional distress, and economic losses.

94.     Plaintiff is therefore entitled to recover damages in an amount to be proven at trial, including attorneys' fees.

## THIRD CLAIM FOR RELIEF

**Forced Labor Violation of the Trafficking Victims Protection Act of 2000, 18 U.S.C. § 1589**
**(Against Both Defendants)**

95.     Ms. Kiwanuka realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

96.     The Defendants knowingly obtained Ms. Kiwanuka's labor and services by patterns of abusive behavior and threatened abuses of legal processes as described by the forced labor provisions of the Trafficking Victims Protection Act, 18 U.S.C. § 1589. Ms. Kiwanuka brings these claims pursuant to the civil cause of action for victims of forced labor in 18 U.S.C. § 1595.

97.     As a direct and proximate result of Defendants' actions, Ms. Kiwanuka has sustained damages, including physical injury, economic loss, and emotional distress.

98.     Plaintiff is therefore entitled to recover damages in an amount to be proven at trial, including attorneys' fees.

## FOURTH CLAIM FOR RELIEF

**Federal Minimum Wage**
**(Against Both Defendants)**

99.     Ms. Kiwanuka realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

100.     The Defendants employed Ms. Kiwanuka within the meaning of the Fair Labor Standards Act, 29 U.S.C. §§ 203(d)-(e).

101.     The Defendants willfully failed to pay Ms. Kiwanuka statutory minimum wages, in violation of 29 U.S.C. § 206(a) and regulations of the United States Department of Labor.

102.     At all times relevant hereto, the relationship between the Defendants and Ms. Kiwanuka was one of private master and servant.

103.    The Defendants' willful violation of the Fair Labor Standards Act entitles Ms. Kiwanuka to recovery of her unpaid minimum wages, an equal amount as liquidated damages, and reasonable attorneys' fees and costs of the action pursuant to 29 U.S.C. §§ 201 *et seq.* and United States Department of Labor regulations, in addition to declaratory relief.

## FIFTH CLAIM FOR RELIEF

### Unjust Enrichment
### (Against Both Defendants)

104.    Ms. Kiwanuka realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

105.    Ms. Kiwanuka rendered services as a live-in domestic servant to the Defendants in good faith and with the expectation that she would be fairly compensated for such services.

106.    The Defendants accepted these services and in turn failed to compensate Ms. Kiwanuka for the fair market value of her services.

107.    The Defendants have been unjustly enriched at Ms. Kiwanuka's expense.

108.    At all times relevant hereto, the relationship between the Defendants and Ms. Kiwanuka was one of private master and servant.

109.    Plaintiff is therefore entitled to recover damages in an amount to be proven at trial, including attorneys' fees.

## SIXTH CLAIM FOR RELIEF

### Negligent Infliction of Emotional Distress
### (Against Both Defendants)

110.    Ms. Kiwanuka realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

111.   The Defendants engaged in negligent conduct toward Ms. Kiwanuka, causing her to suffer severe emotional distress.

112.   The Defendants owed a duty to Ms. Kiwanuka as an employer and as de facto guardians because she was utterly dependent upon them in the United States.  Unfamiliar with U.S. customs and institutions and with limited English skills, Ms. Kiwanuka relied on the Defendants for access to medical care, shelter, and food.  In addition, because Ms. Kiwanuka arrived in the United States on a G-5 visa, her immigration status was entirely dependent upon her employers.  Defendants breached that duty.

113.   As a proximate result of the Defendants' conduct, Ms. Kiwanuka has suffered and will continue to suffer extreme emotional distress.

114.   Plaintiff is therefore entitled to recover damages in an amount to be proven at trial, including attorneys' fees.

## SEVENTH CLAIM FOR RELIEF

### Negligence
### (Against Both Defendants)

115.   Ms. Kiwanuka realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

116.   The Defendants owed a duty to Ms. Kiwanuka as an employer and as de facto guardians because she was utterly dependent upon them in the United States.  Unfamiliar with U.S. customs and institutions and with limited English skills, Ms. Kiwanuka relied on the Defendants for access to medical care, shelter, and food.  In addition, because Ms. Kiwanuka arrived in the United States on a G-5 visa, her immigration status was entirely dependent upon her employers.  Defendants breached that duty.

117.    The Defendants owed Ms. Kiwanuka a duty to provide a safe working environment.  They breached that duty by placing broken glass in a cluttered kitchen sink and allowing it to remain there, knowing that Ms. Kiwanuka was responsible for cleaning the dishes in the sink.  As a proximate result of that unsafe condition, Ms. Kiwanuka sliced open her finger on a shard of the broken glass.

118.    Defendant Bakilana further breached that duty when she startled Ms. Kiwanuka while she was handling boiling water.   As a proximate result of Bakilana's outburst, Ms. Kiwanuka spilled the scalding water on her thigh, burning and blistering her skin and leaving a permanent scar.

119.    The Defendants owed Ms. Kiwanuka a duty to provide prompt medical care when necessary.   They defendants breached that duty when they failed to obtain care for Ms. Kiwanuka after she lacerated her finger on a shard of broken glass.

120.    The Defendants likewise breached their duty to provide prompt medical care when they failed to obtain such care for Ms. Kiwanuka after she burned herself with boiling water.

## EIGHTH CLAIM FOR RELIEF

### Fraudulent Inducement
### (Against Defendant Bakilana)

121.    Ms. Kiwanuka realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

122.    Upon information and belief, Bakilana intentionally and knowingly misrepresented to Ms. Kiwanuka the conditions of her employment and conditions in the United States in order to induce her to come to the United States, under the pretense that, *inter alia,* Ms.

Kiwanuka would attend school and be afforded a reasonable work schedule and reasonable working conditions.

123.    Upon information and belief, Bakilana made the above misrepresentations with the intention that Ms. Kiwanuka would rely on them in order to entice her to come to the United States and to force her to work in their household.

124.    Ms. Kiwanuka did in fact rely on Bakilana's misrepresentations to her detriment and, as a result, Ms. Kiwanuka was forced to work as a domestic worker for the Defendants and was denied the chance to complete her education.    Consequently, Ms. Kiwanuka has suffered great economic, emotional, and physical harm.

125.    Upon information and belief, Bakilana never intended to follow through, and did not follow through, on her promises, notwithstanding any of the aforementioned representations made to Ms. Kiwanuka.   Bakilana did not intend to and did not allow Ms. Kiwanuka to attend school, with the exception of four English-as-a-Second-Language ("ESL") courses over a ten month period in 2004 and 2005; did not plan to and did not give her any days off; did not plan to and did not take care of her medical and social needs; and, in short, did not offer her reasonable working conditions or hours.   Instead, Bakilana planned to force, and did force, Ms. Kiwanuka to work long hours, seven days a week, for herself, Rwehumbiza, and their children.

126.    Upon information and belief, at the time that Bakilana made the foregoing representations and promises to Ms. Kiwanuka, she had no intention of meeting those representations and promises.

127.    Upon information and belief, Bakilana made the foregoing misrepresentations with a conscious and deliberate disregard for the interests of others such that her conduct may be

called willful or wanton and such that her conduct has the character of outrage frequently associated with criminal conduct.

128.   At all times relevant hereto, the relationship between the Defendants and Ms. Kiwanuka was one of private master and servant.

129.   As a direct and proximate result of these actions, Ms. Kiwanuka has sustained physical and economic damages.

130.   Plaintiff is therefore entitled to recover these damages in an amount to be proven at trial, including attorneys' fees.

## NINTH CLAIM FOR RELIEF

### Breach of Contract I
### (Against Defendant Bakilana)

131.   Ms. Kiwanuka realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

132.   Ms. Kiwanuka and Bakilana entered into an employment agreement in 2004, whereby Ms. Kiwanuka agreed to work for the Defendants as a domestic servant and Bakilana agreed to pay Ms. Kiwanuka $7.50 per hour for a 40-hour workweek.  Bakilana also contracted to provide Ms. Kiwanuka with paid days off for holidays, vacation, and illness.  Bakilana further contracted to provide medical insurance and to pay required payroll taxes.

133.   Bakilana intentionally and willfully failed and refused to pay Ms. Kiwanuka the wages promised in her contract.  Ms. Kiwanuka was never given any days off—including weekend days—and was forced to work hours well in excess of a 40-hour workweek.  Bakilana intentionally and willfully failed to provide medical insurance or to pay any required taxes.

134.   Furthermore Bakilana refused to pay Ms. Kiwanuka the wages promised in her contract and failed to provide the conditions and benefits promised in her contract with a

conscious and deliberate disregard for the interests of others such that Bakilana's conduct may be called willful or wanton and such that her conduct has the character of outrage frequently associated with criminal conduct.

135.   At all times relevant hereto, the relationship between the Defendants and Ms. Kiwanuka was one of private master and servant.

136.   Plaintiff is entitled to recover damages in an amount to be proven at trial, including attorneys' fees.

## TENTH CLAIM FOR RELIEF

### Breach of Contract II
### (Against Defendant Bakilana)

137.   Ms. Kiwanuka realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

138.   Ms. Kiwanuka and Bakilana entered into an employment agreement in 2006, whereby Ms. Kiwanuka agreed to work for the Defendants as a domestic servant and Bakilana agreed to pay Ms. Kiwanuka $7.50 per hour for a 40-hour workweek.  Bakilana also contracted to provide Ms. Kiwanuka with paid days off for holidays, vacation, and illness.  Bakilana further contracted to provide medical insurance and to pay required payroll taxes.

139.   Bakilana intentionally and willfully failed and refused to pay Ms. Kiwanuka the wages promised in her contract.  Ms. Kiwanuka was never given any days off—including weekend days—and was forced to work hours well in excess of a 40-hour workweek.  Bakilana intentionally and willfully failed to provide medical insurance or to pay any required taxes.

140.   Furthermore Bakilana refused to pay Ms. Kiwanuka the wages promised in her contract and failed to provide the conditions and benefits promised in her contract with a conscious and deliberate disregard for the interests of others such that Bakilana's conduct may be

called willful or wanton and such that her conduct has the character of outrage frequently associated with criminal conduct.

141.   At all times relevant hereto, the relationship between the Defendants and Ms. Kiwanuka was one of private master and servant.

142.   Plaintiff is entitled to recover damages in an amount to be proven at trial, including attorneys' fees.

## ELEVENTH CLAIM FOR RELIEF

### Breach of Contract III
### (Against Defendant Bakilana)

143.   Ms. Kiwanuka realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

144.   Ms. Kiwanuka and Bakilana entered into a another employment agreement in 2009, whereby Ms. Kiwanuka agreed to work for the Defendants as a domestic servant and Bakilana agreed to pay Ms. Kiwanuka $8.50 per hour for a 40-hour workweek and overtime pay as required by law.  Bakilana also contracted to provide Ms. Kiwanuka paid days off for holidays (5 days), sickness (12 days), and vacation (20 days).

145.   Bakilana intentionally and willfully failed and refused to pay Ms. Kiwanuka the wages promised in her contract.  Ms. Kiwanuka was never given any days off—including weekend days—and was forced to work hours well in excess of a 40-hour workweek.

146.   Bakilana refused to pay Ms. Kiwanuka the wages promised in her contract and failed to provide the conditions and benefits promised in her contract with a conscious and deliberate disregard for the interests of others such that Bakilana's conduct may be called willful or wanton and such that her conduct has the character of outrage frequently associated with criminal conduct.

147.   At all times relevant hereto, the relationship between the Defendants and Ms. Kiwanuka was one of private master and servant.

148.   Plaintiff is entitled to recover damages in an amount to be proven at trial, including attorneys' fees.

## TWELFTH CLAIM FOR RELIEF

### Intentional Infliction of Emotional Distress
### (Against Defendant Bakilana)

149.   Ms. Kiwanuka realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

150.   Bakilana intentionally misrepresented to Ms. Kiwanuka what her life would be once she moved to the United States.

151.   On a daily basis, Bakilana used her position of power and control over Ms. Kiwanuka to engage in an intentional pattern of outrageous verbal abuse against her.

152.   Aware of Ms. Kiwanuka's sense of isolation and distress, Bakilana repeatedly, outrageously, and intentionally prevented her from forming acquaintances or interacting with other individuals, thereby deepening her suffering.

153.   As a proximate result of Bakilana's conduct, Ms. Kiwanuka has suffered and will continue to suffer extreme emotional distress.

154.   Plaintiff is therefore entitled to recover damages in an amount to be proven at trial, including attorneys' fees.

## THIRTEENTH CLAIM FOR RELIEF

### Fraud
### (Against Defendant Bakilana)

155.   Ms. Kiwanuka realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

156.   Upon information and belief, Bakilana intentionally and knowingly misrepresented to Ms. Kiwanuka the conditions of her employment and conditions in the United States in order to induce her to come to the United States, under the pretense that, *inter alia,* Ms. Kiwanuka would attend school and be offered a reasonable work schedule and reasonable working conditions.

157.   Ms. Kiwanuka did in fact rely on Bakilana's misrepresentations to her detriment and, as a result, Ms. Kiwanuka was forced to work as a domestic worker for the Defendants and was denied the chance to complete her education.  Ms. Kiwanuka has suffered great economic and emotional harm.

158.   Upon information and belief, Bakilana made the foregoing misrepresentations with a conscious and deliberate disregard for the interests of others such that her conduct may be called willful or wanton and such that her conduct has the character of outrage frequently associated with criminal conduct.

159.   As a direct and proximate result of these actions, Ms. Kiwanuka has sustained physical and economic damages.

160.   Plaintiff is therefore entitled to recover these damages in an amount to be proven at trial, including attorneys' fees.

**WHEREFORE,** Plaintiff respectfully requests that judgment be granted as follows:

(a) Money damages for each Claim for Relief;

(b) Punitive and exemplary damages according to proof;

(c) Attorneys' fees and costs for Plaintiff against the Defendants; and

(d) Such other further relief as the Court may deem just and proper.

Plaintiff demands a trial by jury.


Respectfully submitted,


Dated:  August 9, 2010                    By: _____
                                          Julie M. Carpenter
                                          (DC Bar No. 418768)
                                          Martina E. Vandenberg
                                          (DC Bar No. 476685)
                                          JENNER & BLOCK LLP
                                          1099 New York Ave., N.W., Suite 900
                                          Washington, D.C. 20001
                                          (v) 202-639-6000
                                          (f) 202-661-4810
                                          jcarpenter@jenner.com
                                          mvandenberg@jenner.com

                                          *Counsel for Sophia Kiwanuka*